**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SANDRA MARKS, | : | CIVIL ACTION NO. 1:05-CV-1558 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | (CONSOLIDATED) |
| | : | |
| THE RESERVE AT HERSHEY | : | |
| MEADOWS, et al., | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM**

This is a personal injury action filed by plaintiff Sandra Marks ("Marks").

Presently before the court are the motions for summary judgment (Docs. 70, 74, 77,

79), filed by defendants The Reserve at Hershey Meadows ("The Reserve"), Media

News Service ("Media"), Bailey Landscape Maintenance Incorporated ("Bailey"),

and William and Amanda Prescott ("the Prescotts").  For the reasons that follow,

the motions (Docs. 70, 74, 77, 79) will be granted.

I.   **Statement of Facts**[1]

The dispute in the instant case centers around an accident that befell Marks

on July 19, 2004.  A few weeks prior to that date, Marks had begun residing in an

apartment leased by her employer and owned by The Reserve.  (Doc. 71-2 at 8, 127.)

At 10:30 a.m. on the date of her accident, Marks backed her truck out of her garage

and reentered her apartment through the garage door, which was her typical route

---

[1]  In accordance with the standard of review for a motion for summary
judgment, the court will present the facts in the light most favorable to Marks, the
non-moving party.  See infra Part II.

of ingress to and egress from the apartment.[2]  (Id. at 10.)  At approximately 4:00 p.m., Marks was exiting the front door of her apartment when she slipped and fell on several newspapers that were wrapped in orange plastic.[3]  (Doc. 70 ¶ 1; Doc. 71-2 at 21.)  Marks testified that, at the time of her accident, she was looking straight ahead and did not "look straight down."  (Id. at 18-19.)  Marks sustained injuries including a broken right wrist, back strain, and "a severe shock to her entire nervous system."  (Doc. 1 ¶ 12; Doc. 70 ¶ 1.)

After her accident, Marks learned that the newspapers on which she had fallen were issues of The Lebanon Daily News.  (Doc. 74-6 at 2; Doc. 71-2 at 21.)  Marks, who was not a subscriber of The Lebanon Daily News, was unsure of the source and origin of the newspapers.  (Doc. 1 ¶ 8; Doc. 7 ¶ 8; Doc. 74-6 at 2.)  Marks testified that she had never noticed an accumulation of newspapers at her door-front because she "didn't pay attention to that sort of thing."  (Doc. 92-3 at 3.)  Accordingly, Marks never complained to The Reserve or to anyone else about the newspapers prior to her accident.  (Doc. 71-2 at 35.)  The Reserve's property manager, Robbin Roth, also testified that neither she nor anyone else at The Reserve was aware of the accumulation of newspapers in front of Marks' apartment door.  (Doc. 71-3 at 9-10; Doc. 77-9 at 3.)

---

[2] Marks testified that she had only used the front door of her apartment on one occasion prior to her accident.  (Doc. 71-2 at 28, 30.)

[3] Marks estimates the number of newspapers on which she fell to be between two and seven.  (Doc. 71-2 at 42.)

2

Marks now attributes her injuries to the negligence of The Reserve, as well as Media, the Prescotts, and Bailey.  Media is an entity in the business of selling and delivering newspapers, including <u>The Lebanon Daily News</u>.  (Doc. 1 ¶ 6; Doc. 7 ¶ 6.) Media hired the Prescotts to deliver newspapers to The Reserve.  (Civil Action No. 1:06-CV-1339, Doc. 1 ¶¶ 8-9; Doc. 3 ¶¶ 5.)  Media provided the Prescotts with newspapers that were to be used for purposes of soliciting new customers.  The Prescotts delivered these newspapers to various locations, including The Reserve.[4] (Civil Action No. 1:06-CV-1339, Doc. 1 ¶¶ 14, 15; Doc. 3 ¶¶ 1, 6.)  William Prescott ("William") testified that he threw each newspaper that he delivered to The Reserve from his car window to a location approximately two feet from the street.  (Doc. 74-3 at 1; Doc. 77 ¶ 10; Doc. 88 ¶ 10.)  He estimated that Marks' front door was approximately forty feet from the street and said that it would have been impossible for him to throw a newspaper that distance.  (Doc. 74-3 at 1.)  William also testified that he attempted to place at least part of each newspaper in the grass to decrease the likelihood that it would be swept away by water or wind.  (<u>Id.</u>)

Bailey is a company that was responsible for performing landscaping and lawn mowing services for The Reserve at the time of Marks' accident.  (Civil Action No. 1:06-CV-914, Doc. 1 ¶ 7; Doc. 5 ¶ 7.)  Marks alleges that Bailey regularly removed newspapers from the lawns at The Reserve and "toss[ed] them in front of garage

---

[4] Marks admits that Amanda Prescott did not deliver newspapers to The Reserve near the time of Marks' accident.  (Doc. 77 ¶ 6; Doc. 88 ¶ 6.)  Because Amanda Prescott was not personally involved in the events leading up to Marks' accident, the court will grant summary judgment in favor of Amanda Prescott on all claims against her without further discussion.

doors and in front of apartment doors to facilitate their lawn mowing duties."

(Doc. 86 ¶ 3.)  Marks admits that she never personally observed a Bailey employee

moving a newspaper.  (Doc. 74-6 at 3-4.)  Marks' allegations against Bailey are based

solely upon an excerpt of William's deposition testimony dated February 2, 2006, in

which William indicated that he had witnessed Bailey employees moving

newspapers to facilitate lawn mowing.  (Doc. 74-6 at 4.)  The relevant portion of

William's deposition testimony is as follows:

> Q. Did you ever come to find out how it was that a newspaper that you would have delivered . . . would have made it to the front porch of the apartment rented by the tenants at [The Reserve]?
> A. I am not exactly sure on [The Reserve].  I do know during our time of delivering, you deliver 25 papers a day, 50 over a two day period, customers would not pick up the paper.  And I have always noticed that when the grass was cut, the papers were up against the garage door or up against the door.  And I had witnessed a couple times a lawn mower, people just tossing them up against the garage door.
> Q. They would pick them up at the area that you had delivered them?
> A. Right.  Because they wanted to cut the grass, obviously they didn't want to run the paper over.
> Q. I did not catch that last part as to who would have taken the – if someone would not have picked up the paper for a couple of days, who would have taken them up to either the garage door or the front door?  Did you understand?
> A. Yes.  I witnessed the landscaping people had taken some of my papers and put them against the garage door of the home that I placed it at the day before or two days before.
> Q. So in other words, if somebody wasn't picking up the paper, and they were going to do some landscaping or whatever, they would sometimes or at least you witnessed them take the papers from the area where they were collecting and then take them up to the door or the garage door, the front door or the garage door?
> A. Yes.
> Q. Did you ever identify the name of the landscaping company?
> A. Yes, it was Baily's [sic] Landscaping . . . .
>
> . . .

Q.  I am trying to find out where you saw these landscapers move the newspapers.

A.  Most of the time they would just, you know, toss them as close to the garage as they can get, that's what I seen [sic] both times that I witnessed it.

Q.  Did you ever see them toss newspapers in front of a door, that is a door to enter an apartment?

A.  No.

(Doc. 71-3 at 14-15, 17.)[5]

For purposes of the instant litigation, Marks retained a forensic architect who authored an expert report.[6]  (Doc. 77 ¶ 17; Doc. 88 ¶ 17.)  The expert concluded that the accumulation of newspapers on Marks' front porch created a "hazardous and unexpected slipping condition" and constituted a violation of local property

---

[5]  In a second deposition dated January 5, 2007, William proffered the following contradictory testimony:

Q.  There was some suggestion that perhaps you had seen landscaping people move papers?

A.  What I do is the papers were delivered.  You go through.  The grass is being cut.  The papers aren't there anymore.  Somebody had to move them.  It wasn't me and I just.

Q.  That was speculation?

A.  That was speculation that it was somebody else.

Q.  So at The Reserve you haven't seen anyone other than [a] resident move a paper?

A.  No.

(Doc. 74-4 at 1.)  Viewing the evidence in the light most favorable to Marks, the court must consider William's previous testimony for purposes of summary judgment.

[6]  This expert testimony is the subject of three motions in limine (Docs. 93, 96, 102).  Even when considering the testimony, the court finds that Marks has failed to establish a *prima facie* case of negligence against any of the defendants.  See infra Part III.  Therefore, the court need not decide the issues presented by the motions in limine (Docs. 93, 96, 102).

maintenance codes. (Doc. 71-3 at 26.) The expert also conceded that he did not know *how* the newspapers came to be in front of Marks' door and stated that responsibility for Marks' accident "would be incumbent on the person who did put [the newspapers] at [Marks'] door." (Doc. 77 ¶ 18; Doc. 88 ¶ 18; Doc. 77-8 at 5.)

On August 3, 2005, Marks commenced the above-captioned action against The Reserve and Media. (Doc. 1.) Thereafter, Marks commenced separate actions against Bailey and the Prescotts. (Civil Action No. 1:06-CV-914, Doc. 1; Civil Action No. 1:06-CV-1339, Doc. 1.) Marks then filed motions to consolidate the three pending actions. (Civil Action No. 1:06-CV-914, Docs. 6, 10.) Marks' motions to consolidate were granted by order of court dated August 23, 2006, and the actions pending against Bailey and the Prescotts were consolidated into the above-captioned case. (Doc. 54.)[7] Between February 23, 2007 and February 28, 2007, all defendants filed motions for summary judgment alleging that Marks has failed to establish a *prima facie* case of negligence. (Docs. 70, 74, 77, 79.) The motions have been fully briefed and are ripe for disposition.

## II.   <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality. <u>See</u> FED. R. CIV. P. 56(c). It places the burden on the non-moving party to come forth with "affirmative evidence,

---

[7] By order of court dated February 8, 2007 (Doc. 69), the court granted Bailey's concurred-in motion to deem each defendant's answer to include crossclaims for contribution and indemnity against all other defendants.

beyond the allegations of the pleadings," in support of its right to relief.  Pappas v.

City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see

also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see

also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   Discussion[8]

Under Pennsylvania law, the "mere occurrence of an injury does not give rise

to an inference that one of the parties involved was negligent."  Markovich v. Bell

Helicopter Textron, Inc., 805 F. Supp. 1231, 1236 (E.D. Pa. 1992) (citing Hamil v.

Bashline, 392 A.2d 1280, 1284 (Pa. 1978)).  Instead, to prevail on a negligence claim,

a plaintiff must establish:  (1) a duty recognized by law requiring the defendant to

conform his or her conduct to a certain standard of care; (2) a breach of that

standard of care; (3) a causal connection between the breach and the resulting

---

[8] Jurisdiction over all of the parties' claims is based on diversity of citizenship, see 28 U.S.C. § 1332, and none of the parties dispute the applicability of Pennsylvania law, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938); see also Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir. 1992) (noting that federal courts sitting in diversity must apply the substantive law of the state of the forum state).  In diversity cases where "the state's highest court has not considered the precise question to be answered, the federal court is called upon to predict how the state court would resolve the issue should it be called upon to do so."  Kleinknecht v. Gettysburg Coll., 989 F.2d 1360, 1365-66 (3d Cir. 1993).  To the extent that the Supreme Court of Pennsylvania has not addressed the precise issues raised by Marks in the instant case, this memorandum constitutes such a prediction.

injury; and (4) actual damage to the plaintiff.  <u>Farabaugh v. Pa. Turnpike Com'n</u>,

911 A.2d 1264, 1272-73 (Pa. 2006).  In the instant case, Marks attributes her injuries

to the negligence of Media, William Prescott, Bailey, and The Reserve.  The court

will address Marks' negligence claims against each of these defendants in turn.

### A.   <u>Media</u>

Media argues that Marks' negligence claim falls short because Marks has

failed to establish that Media owed her a duty of care.  A duty of care is "an

obligation to which the law will give recognition and effect, to conform to a

particular standard of conduct toward another."  <u>Atcovitz v. Gulph Mills Tennis</u>

<u>Club, Inc.</u>, 812 A.2d 1218, 1222 (Pa. 2002).  The concept of duty of care is "rooted in

often amorphous public policy considerations" and is ultimately an issue of fairness.

<u>Id.</u>; <u>Petrongola v. Comcast-Spectacor, L.P.</u>, 789 A.2d 204, 210 (Pa. Super. Ct. 2001).

Whether a defendant owes a duty of care to a plaintiff is a question of law for the

court.  <u>Kleinknecht v. Gettysburg Coll.</u>, 989 F.2d 1360, 1366 (3d Cir. 1993); <u>see also</u>

<u>Brisbine v. Outside In Sch. of Experimental Educ., Inc.</u>, 799 A.2d 89, 95 (Pa. Super.

Ct. 2002).

Under Pennsylvania law, the existence of a duty of care is "predicated on the

relationship between the plaintiff and the defendant," <u>Markovich</u>, 805 F. Supp. at

1236, and arises only when a defendant "engages in conduct which foreseeably

creates an unreasonable risk of harm" to a particular plaintiff, <u>Petrongola</u>, 789 A.2d

at 210.  Other factors that a court may consider when deciding whether to impose a

duty of care upon a defendant include:  (1) the social utility of the defendant's

conduct; (2) the nature of the risk created by the defendant's conduct; and (3) the consequences of imposing a duty upon the defendant.  <u>Sharpe v. St. Luke's Hosp.</u>, 821 A.2d 1215, 1219 (Pa. 2003).

In the instant case, the court finds that no special relationship existed between Media and Marks sufficient to justify the imposition of a duty of care. There was no "written contract or oral agreement" between Media and Marks relative to the delivery of newspapers.  <u>See</u> <u>Clark v. Fuchs</u>, No. CIV. A. 93-1422, 1994 WL 13847, at *3 (E.D. Pa. Jan. 14, 1994) (concluding that a newspaper company did not owe an injured plaintiff a duty of care where there was no contract between the parties).  In addition, there is no evidence of record to suggest that Media was even aware that one of its newspapers had been delivered to Marks prior to her accident. While Media asked the Prescotts to deliver newspapers for purposes of solicitation, Media did not dictate to whom these newspapers should be delivered, and there is no evidence that the vicinity of Marks' apartment was a specific, intended target of Media's solicitation.  (Civil Action No. 1:06-CV-1339, Doc. 1 ¶¶ 14, 15; Doc. 3 ¶¶ 1, 6); <u>see also</u> <u>Sharpe</u>, 821 A.2d at 1219 (citing the fact that the plaintiff "was known to the defendant" as a significant factor in imposing a duty of care).

Furthermore, the court finds that Media's conduct did not create a foreseeable risk of harm to Marks.  While Marks argues that the delivery of newspapers "wrapped in slippery plastic bags" created a foreseeable risk of harm sufficient to justify the imposition of a duty of care (<u>see</u> Doc. 88 ¶ 21), the court disagrees.  Delivery of plastic-wrapped newspapers is a common occurrence that

has social utility and serves a public purpose.  Any risk of harm imposed thereby is minimal at best and is outweighed by the detriment that would result if newspaper companies were prohibited from using plastic wrapping to protect their products. See Sharpe, 821 A.2d at 1219; see also Renick v. Asbury Park Press, No. 5057-03, 2006 WL 457724, at *2 (N.J. Super. Ct. App. Div. Jan. 11, 2006) (declining to extend a duty of care to a newspaper company because the manner of delivery of the newspaper was "commonplace and predictable" and no "public policy purpose" would be served by imposing a duty of care upon the company).

In reaching these conclusions, the court is persuaded by the reasoning of our sister court in the Eastern District of Pennsylvania, which held that a newspaper delivery company owed "no duty or obligation recognized by law to deliver papers in a certain way." Clark, 1994 WL 13847, at *1-*3.  Likewise, the Superior Court of New Jersey has opined that taxing newspaper companies with the duty of delivering newspapers in a specific manner would constitute an "unreasonable burden" and would lead to endless "permutations of possible problems." Renick, 2006 WL 457724, at *2.  Specifically, the court listed the following questions that could arise if newspaper companies were burdened with the duty of delivering newspapers in a certain manner:

10

> [W]hat is the standard for how the newspaper delivery should be made?
> How would the newspaper publisher prove where an independent delivery
> person left the newspaper?  If the publisher directs the manner of delivery,
> do the delivery persons now become employees of the publisher, which likely
> would increase the cost to produce the newspaper?  How could the publisher
> prove whether another intervening party moved the newspaper?  What is the
> class of plaintiffs not covered by this proposed duty?  Would a pedestrian
> who fell on a newspaper left curbside now be owed a duty?  What if another
> pedestrian or a local dog moved the newspaper's location causing another to
> fall?

Id.  The court finds that imposing such an onerous and unmanageable burden on
newspaper companies would not serve the public policy purposes that underlie the
law's definition of a duty of care.  See Atcovitz, 812 A.2d at 1222.

Having found that Media and Marks did not have a special relationship, that
Media's conduct did not create a foreseeable risk of harm to Marks, and that
imposing a duty of care on newspaper companies would constitute an unreasonable
burden, the court will decline to extend a duty of care to Media.  Media's motion for
summary judgment will be granted.[9]

### B.   William Prescott[10]

William argues that Marks' negligence claim against him fails for lack of
evidence of proximate causation.  Under Pennsylvania law, proximate causation is
defined as "that which, in a natural and continuous sequence, unbroken by an

---

[9]  Even assuming *arguendo* that Media owed Marks a duty of care, Marks'
claim against Media would still fail for lack of evidence of proximate causation.  See
infra Part III.C.

[10]  Marks' claim against Amanda Prescott fails because Marks concedes that
Amanda was not involved in the delivery of the newspaper on which she fell.  See
supra note 4.

11

efficient intervening cause, produces the [plaintiff's] injury." <u>Noon v. Knavel</u>, 339 A.2d 545, 557 (Pa. Super. Ct. 1975). Proximate causation is established when a defendant's wrongful conduct is a "substantial factor in bringing about the specific harm incurred."[11] <u>Gutteridge v. A.P. Green Servs., Inc.</u>, 804 A.2d 643, 655 (Pa. Super. Ct. 2002). Whether a defendant's conduct was a substantial factor in causing a plaintiff's injury is "ordinarily a question of fact for the jury." <u>Id.</u> However, the existence of proximate causation may be resolved by the court "where the proposed chain of causation is so attenuated, so dependent upon unprovable contingencies, that the plaintiff is not within the group of individuals properly able" to hold the defendant liable. <u>Klingler v. Yamaha Motor Corp.</u>, 738 F. Supp. 898, 908 (E.D. Pa. 1990).

William's undisputed testimony is that he delivered Marks' newspaper to an area approximately two feet from the street and that he did not, and in fact could not, throw the newspaper directly onto Marks' front porch. (Doc. 74-3 at 1; Doc. 77 ¶ 10; Doc. 88 ¶ 10.) Marks concedes that she has no personal knowledge of how the newspaper came to be located on her front porch, but argues that the newspaper

---

[11] The court notes that the most recent amendment to the Pennsylvania Suggested Standard Civil Jury Instructions abandons the term "proximate cause" in favor of the term "factual cause." PENNSYLVANIA SUGGESTED STANDARD CIVIL JURY INSTRUCTIONS § 3.15 (3d ed. 2005). This is a semantic distinction without a legal difference. In the subcommittee note that accompanies the pattern instructions, the drafters indicate that the term proximate cause was abandoned because it "means nothing to an ordinary jury." <u>Id.</u> Nevertheless, the concept of proximate cause is retained within the pattern instructions' factual cause definition, which states that in order for a defendant's conduct to be considered a factual cause, it must be "more than an insignificant factor" in bringing about the plaintiff's injury. <u>Id.</u>

was moved by Bailey to facilitate their lawn mowing duties. (Doc. 74-6 at 2; Doc. 88 ¶ 10.) Even viewing this evidence in the light most favorable to Marks, the court finds that a reasonable jury could not conclude that William's actions were a proximate cause of Marks' injuries. See Gutteridge, 804 A.2d at 655. Marks admits that a third-party relocated the newspapers after William delivered them. This constitutes a sufficient intervening force to break the chain of causation and to absolve William of any liability for his actions. See Noon, 339 A.2d at 557. Accordingly, the court will grant William's motion for summary judgment.

### C.   Bailey

Bailey argues that Marks' negligence claim falls short because Marks has failed to proffer any evidence, beyond mere speculation or conjecture, to support her claim that a Bailey employee moved the newspaper on which she fell. Addressing the causal proof needed to reach the jury, Pennsylvania courts have repeatedly observed that more than "guess or conjecture" is required. Martino v. Great Atl. & Pac. Tea Co., 213 A.2d 608, 610 (Pa. 1965); see also Smith v. Bell Telephone Co., 153 A.2d 477, 479-80 (Pa. 1959) ("We have said many times that the jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but that there must be evidence upon which logically its conclusion may be based. . . ."). In Myers v. Penn Traffic Co., 606 A.2d 926 (Pa. Super. Ct. 1991), the Pennsylvania Superior Court affirmed the entry of summary judgment in favor of a store owner on a customer's claim that she had slipped on a grape. The only evidence that the grape had been placed on the floor by a store employee was "the

fact that produce frequently fell to the floor when employees filled the produce cases." Id. at 931. The court held that this evidence was insufficient to permit the issue of causation to reach the jury and noted that:

> [N]othing in the record supports an inference that the grape was on the floor because the store's employees dropped it there when putting produce in the cases. It is just as likely that another customer of the store dropped the grape on the floor. Without evidence that one or the other of these two equally likely occurrences caused the grape to be on the floor, there is no issue to be tried. Any decision would be based on mere speculation.

Id. at 930.

In the instant case, Marks concedes that she never noticed an accumulation of newspapers in front of her door prior to her accident and that she has no personal knowledge of how the newspapers came to be located there. (Doc. 92-3 at 2; Doc. 74-6 at 2.) Marks also admits that she never personally observed a Bailey employee moving a newspaper and that her negligence claim against Bailey is based solely upon the deposition testimony of William Prescott. (Id. at 3-4.) In reviewing William's testimony, it is important to note what is patently absent therefrom. William did not testify that he ever observed a Bailey employee moving a newspaper onto Marks' front porch or onto any front porch at The Reserve. (Doc. 71-3 at 17.) Nor did William testify that he saw a Bailey employee moving newspapers on or around July 19, 2004, the date of Marks' accident. The substance of William's testimony was simply that he had twice witnessed Bailey employees moving newspapers to a location "against the garage door[s]" of the apartments at The Reserve. (Id. at 14-15.)

Viewing this evidence in the light most favorable to Marks, the court nevertheless finds it insufficient to survive summary judgment.  The causal nexus is simply too tenuous.  The court has carefully examined the record as developed by the parties and has found no evidence to suggest that it is more likely than not that a Bailey employee moved the offending newspaper.  A world of possibilities remains as to how the newspaper came to be located on Marks' front porch.  The newspaper could have been moved by a helpful neighbor, by a pedestrian walking through The Reserve, or even a wayward express mail courier.  Just as in <u>Myers</u>, where evidence that store employees frequently dropped grapes was insufficient to establish that an employee had dropped the particular grape on which the plaintiff had fallen, the fact that Bailey employees occasionally moved newspapers to facilitate their lawn mowing duties does not establish a sufficient causal connection for a reasonable jury to find that they moved the specific newspaper on which Marks slipped.  <u>See</u> 606 A.2d at 931.  Given this level of conjecture regarding causation, the court cannot permit the issue to be submitted to the jury and will grant Bailey's motion for summary judgment.

D.   **The Reserve**

The Reserve argues that Marks' negligence claim fails for lack of evidence that it breached any duty of care relative to the accumulation of newspapers on her front porch.  A landowner's duty of care "toward a third party entering the land depends upon whether the entrant is a trespasser, licensee, or invitee." <u>Cresswell v. End</u>, 831 A.2d 673, 675 (Pa. Super. Ct. 2003); <u>see also</u> <u>Carrender v. Fitterer</u>, 469

A.2d 120, 123 (Pa. 1983).  In the instant case, the parties do not dispute that Marks was an invitee on The Reserve's property at the time of her accident.[12]  (Doc. 70 ¶ 19; Doc. 91 at 8-9.)  The duty of care owed to an invitee is "the highest duty owed to any entrant upon land," Gutteridge, 804 A.2d at 656, and requires landowners to protect invitees from both known and foreseeable harms, Carrender, 469 A.2d at 123 (citing RESTATEMENT (SECOND) OF TORTS §§ 341A, 343, 343A).  Specifically, a landowner may be held liable for physical harm caused to an invitee by a condition on the land if he or she:

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitee, and
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> (c) fails to exercise reasonable care to protect them against the danger.

RESTATEMENT (SECOND) OF TORTS § 343; see also Farabaugh, 911 A.2d at 1272 n.10.

To establish that a landowner had notice of a hazardous condition sufficient to trigger a duty of care, an invitee must prove either that the landowner "had a hand in creating the harmful condition" or had actual or constructive notice of the

---

[12]  Pennsylvania law defines the term "invitee" as follows:

(1) An invitee is either a public invitee or a business visitor.
(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.
(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land.

Gutteridge, 804 A.2d at 655-56.

condition. <u>Estate of Swift v. Ne. Hosp. of Phila.</u>, 690 A.2d 719, 723 (Pa. Super. Ct. 1997); <u>see also</u> <u>Clark</u>, 1994 WL 13847, at *2. In the instant case, there is no evidence of record to suggest that The Reserve either created or had actual notice of the presence of the newspapers on Marks' front porch. To the contrary, Marks testified that she never complained to anyone at the Reserve about the accumulation of newspapers near her front door prior to her accident. (Doc. 71-2 at 35.) The Reserve's property manager also testified that neither she nor anyone else at The Reserve was aware of or contributed to the accumulation of newspapers at Marks' door. (Doc. 71-3 at 9-10; Doc. 77-9 at 3.) Accordingly, Marks must establish that The Reserve had constructive notice of the presence of the newspapers to succeed on her claim of negligence.

To establish constructive notice, an invitee must prove "that the condition existed for such a length of time that in the exercise of ordinary care the proprietor should have known of it and taken action to remedy it." <u>Brandenstein v. Great Atl. & Pac. Tea Co.</u>, 275 F.2d 725, 726 (3d Cir. 1960); <u>see also</u> <u>Clark</u>, 1994 WL 13847, at *2 (citing <u>Moultrey v. Great A&P Tea Co.</u>, 422 A.2d 593, 595 (Pa. 1980)); <u>Neve v. Insalaco's</u>, 771 A.2d 786, 791 (Pa. Super. Ct. 2001) ("What constitutes constructive notice must depend on the circumstances of each case, but one of the most important factors to be taken into consideration is the time elapsing between the origin of the defect or hazardous condition and the accident."). The "mere presence of a dangerous condition of a transitory nature" on a landowner's property is insufficient to impose liability on that landowner. <u>Flocco v. Super Fresh</u>

17

Mkts., Inc., No. CIV. A. 98-902, 1998 WL 961971, at *2 (E.D. Pa. Dec. 29, 1998).  The

condition's presence does not establish whether it had been there "a few seconds, a

few minutes, a few hours or even a few days."  David by Berkeley v. Pueblo

Supermarket, 740 F/2d 230, 234 (3d Cir. 1984).  Absent such evidence, the condition

could have "happened merely seconds before plaintiff's fall, thereby making it

impossible for [the] defendant to have notice as a matter of law."  Read v. Sam's

Club, No. 5-170, 2005 WL 2346112, at *3 (E.D. Pa. Sept. 23, 2005).

In the instant case, Marks has presented no evidence to indicate how long the

newspapers were in the area near her front door.  Absent such evidence, it is

inappropriate to permit Marks to prove her claim using constructive notice.[13]

Accordingly, the court finds that The Reserve did not have a duty to protect Marks

and cannot be held liable for her injuries.  Accord Martino, 213 A.2d at 610 (granting

summary judgment where plaintiffs presented no evidence to show how long grape

had been on floor); Moultrey, 422 A.2d at 596-97 (same, where plaintiff fell on

cherry); Estate of Swift, 690 A.2d at 722 (same, where plaintiff fell on water); Flocco,

1998 WL 961971, at *2-3 (same, where plaintiff fell on gravy); Clark, 1994 WL 13847,

at *3 (same, where plaintiff fell on newspaper).  The court will grant The Reserve's

motion for summary judgment.

---

[13]  Marks' claim that she fell on two to seven newspapers is insufficient to
satisfy the time requirement for constructive notice.  See supra note 3.  There is no
evidence of record to suggest that the newspapers were individually deposited at
Marks' door-front over a span of days or weeks.  It is equally likely that all of the
newspapers were transferred to Marks' front porch simultaneously.  Because such a
transfer could have taken place just moments before Marks' accident, constructive
notice is not established.  See Read, 2005 WL 2346112, at *3.

## IV.    **Conclusion**

For the foregoing reasons, the court will grant defendants' motions for

summary judgment (Docs. 70, 74, 77, 79).  An appropriate order will issue.


     S/ Christopher C. Conner    
CHRISTOPHER C. CONNER
United States District Judge


Dated:       June 29, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SANDRA MARKS,** | : | **CIVIL ACTION NO. 1:05-CV-1558** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | **(CONSOLIDATED)** |
| | : | |
| **THE RESERVE AT HERSHEY** | : | |
| **MEADOWS, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 29th day of June, 2007, upon consideration of the motions for summary judgment (Docs. 70, 74, 77, 79), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.  The motion for summary judgment (Doc. 70), filed by defendant The Reserve at Hershey Meadows, is GRANTED.

2.  The motion for summary judgment (Doc. 74), filed by defendant Bailey Landscape Maintenance Incorporated, is GRANTED.

3.  The motion for summary judgment (Doc. 77), filed by defendant Media News Service, is GRANTED.

4.  The motion for summary judgment (Doc. 79), filed by defendants William Prescott and Amanda Prescott, is GRANTED.

5.  The Clerk of Court is directed to enter JUDGMENT in favor of defendants and against plaintiff on all claims.

6.  The Clerk of Court is directed to CLOSE this case.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge